E-FILED
Tuesday, 13 September, 2022  01:34:19 PM
Clerk, U.S. District Court, ILCD

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| DION GRAHAM, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 20-cv-1400-JES-JEH |
| | ) | |
| CATERPILLAR, INC., | ) | |
| | ) | |
| Defendant. | ) | |

### <u>ORDER AND OPINION</u>

This matter is now before the Court on the Motion for Summary Judgment (Doc. 22) of Defendant Caterpillar, Inc. The pro se Plaintiff, Dion Graham, had filed an initial Response to summary judgment which was stricken as it did not comply with the Local Rules. Plaintiff was given leave to file an Amended Response and warned that the "[f]ailure to respond to any numbered fact in Defendant's Motion will be deemed an admission of that fact. CDIL-LR 7.1(D)(2)(b)(6)." Plaintiff subsequently filed an Amended Response (Doc. 26) and Defendant Replied. For the reasons set forth below, Defendant's Motion (Doc. 22) is GRANTED.

### I.     BACKGROUND

As noted, the Court has reviewed Plaintiff's amended response which, despite the Court's prior instruction, consists solely of a section titled "Dispute of facts" without the identification of other disputed and undisputed facts as required by CD-IL LR 7.1(D)(2)(b). In addition, Plaintiff does not provide an Argument Section or address Defendant's cited authorities as required under 7.1(D)(c). Nonetheless, the Court will consider those facts which Plaintiff identifies as disputed and will accept as undisputed all other facts cited by Defendant. *See Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 922 (7th Cir. 1994) (finding that the non-movant conceded the movant's version of the facts by failing to submit a proper factual statement).

There is yet another issue as Defendant asserts that Plaintiff attached exhibits to his Response which were not disclosed in discovery. Defendant also asserts that Plaintiff has not laid a proper foundation for these exhibits which, the Court notes, appear largely to be emails and telephone screen shots. Plaintiff has added some handwritten notes in the margins, identifying the parties who ostensibly participated in the conversations, but does not generally explain the context of the messages. Defendant objects to the admission of the exhibits as hearsay, as not having been disclosed in discovery, and for lack of a proper foundation. The Court agrees, and did not consider them in this decision.

## II.    MATERIAL FACTS

Plaintiff, a former Caterpillar employee, has asserted claims of racial discrimination, hostile work environment, and retaliation under Title VII, 42 U.S.C. 2000e *et seq*. Plaintiff began working at Caterpillar in April 2017 and, at all relevant times, was a union member subject to a collective bargaining agreement. In 2018, Plaintiff was promoted to the position of Material Specialist-4. Plaintiff's job duties largely entailed operating a furnace which melted iron at temperatures between 2700 and 2900 degrees and pouring the liquified iron into castings.

Defendant has provided uncontested evidence that in the time he worked at Caterpillar, Plaintiff received 11 "coaching sessions" in response to disciplinary infractions, two finite suspensions and one indefinite suspension. Plaintiff was eventually terminated when he failed to return to work after an approved leave of absence. Plaintiff is not bringing a claim as to this termination, only to the events which preceded it.

Plaintiff, who is African American, asserts that during his employment at Caterpillar he was treated differently than other employees; he was punished for conduct for which others were not punished; he was confronted by several co-workers outside of the bathroom, one of these

2

same co-workers called him a "baby;" another brought him the wrong alloys; and he was asked to do tasks which were not part of his job. While Plaintiff claims that he was subjected to racial discrimination and a hostile work environment, he never unequivocally testified that any of these actions were related to race. The clearest connection he made was his complaint to Labor Representative Andrew Schafer that Plaintiff's Supervisor, Codie Garrett "sometimes came across as racist." Plaintiff also alleges that Caterpillar retaliated against him by indefinitely suspending him due to his complaint about Garrett.

### THE FIRST SUSPENSION

On May 10, 2019, Plaintiff's previous supervisor, Ryan Morris, reported to Andrew Schafer that Plaintiff had refused to participate in a startup meeting and had used profanity when complaining to employees in the Medical Department. Plaintiff was issued a 3-day suspension, with the union filing, and later withdrawing, a grievance of the matter. Plaintiff contests this account, asserting only that a nurse merely overheard him using the "F bomb" while he was planting flowers and talking with a co-worker. Plaintiff does not address his alleged refusal to participate in the meeting and does not allege that the suspension was racially motivated.

### THE SECOND SUSPENSION

On September 9, 2019, Plaintiff's supervisor, Codie Garrett, gave him a 5-day suspension for a purported safety violation. Wade Ballinger, Garrett's Supervisor and the Group Manager, has submitted affidavit testimony that he informed Garrett that he had seen Plaintiff throwing 20–25 pound risers into a bucket from a distance of approximately five feet, conduct determined to be unsafe. The Union initially grieved the suspension but later withdrew the grievance. When questioned at his deposition, Plaintiff said that he could not say that he was suspended because of his race. He stated that when he returned to work, however, he saw another co-worker, Kris

3

Munter, doing the same thing. When questioned, Plaintiff admitted that he was not sure how far Munter was from the bucket when he threw the risers into it. In addition, he did not testify that anyone in management was aware of this action by Munter.

**COMPLAINTS ABOUT CO-WORKERS**

<u>MUNTER AND WATSON CONFRONT PLAINTIFF</u>

Plaintiff has asserted that on October 10, 2019, right before the lunch break, the weigh scale on the pour deck "went out," and Plaintiff walked away to wash his hands. While Plaintiff stood outside the bathroom, co-worker Kris Munter walked up cursing, asking Plaintiff what he was going to do. Plaintiff testified that when Munter got nose-to-nose with him, he responded that he did not care. At that point another co-worker, Marc Watson, walked up and stated, "we know you don't care." Plaintiff testified that he backed up until he was against the wall. (Doc. 24-1 at 96-98). At that point, a supervisor, Mr. Bloomer, walked up and the episode ended. When asked, Plaintiff testified that neither Munter nor Watson said anything of a racial nature during the exchange. (Doc. 24-1 at 96-102).

That same day, Plaintiff complained to Schafer in Labor Relations, telling him only that that Munter had been mad due to the equipment failure. He did not claim that the incident was racially motivated but testified at his deposition that he later came to the conclusion that it was. *Id*. at 105. Plaintiff asked Schafer to have him transferred. Schafer responded that if Plaintiff wanted to change jobs, he would have to follow the bidding procedures in the collective bargaining agreement. Plaintiff questions this, claiming that he did not have to bid when he was promoted to his then-current job.

Plaintiff also complains that when Munter was suspended for the incident and later returned to work, he was put back in the same areas as Plaintiff. Plaintiff claims, without detail,

that this made him feel unsafe and that Caterpillar had the responsibility to make sure he was

safe. When asked, Plaintiff testified that he "was not sure" whether Schafer's alleged failure to

transfer him was racially motivated. (Doc. 24-1 at 112).

Andrew Schafer has submitted an uncontested declaration, asserting that an investigation

of the confrontation was conducted. Watson received a verbal reprimand and Munter, who had

no prior disciplinary history, was indefinitely suspended. The Union grieved the incident and

Schafer attests that, due to the lack of prior history and Munter admitting that he lost his temper

with Plaintiff, Caterpillar settled the grievance and Munter returned to work on October 17,

2019. (Doc. 24-4 at 4).

On October 11, 2019, the day after the incident with Munter and Watson, Plaintiff was

working at the furnace. He testified that Watson brought him alloys to be placed in the furnace.

Plaintiff testified, "He brought the wrong alloys and wanted me to put it into the furnace, and

which could have caused a bomb or anything." *Id*. at 116. Plaintiff testified that the materials

supplied by Watson were wet and not the correct materials for that type of iron he was making.

Plaintiff complained to Garrett, who reportedly laughed-off the incident. Plaintiff went to Wade

Ballinger, who was not sympathetic, and then to "HR", actually Labor Relations. Plaintiff

testified that he believed Watson did this purposefully because of the incident with Munter, but

did not claim it was racially motivated. *Id*. at 119, 126.

SUPERVISOR CODIE GARRETT

On November 11, 2019, Plaintiff was working the day shift from 7:00 AM until 3:00 PM.

At approximately 2:45 PM, Codie Garrett asked him to unclamp molds Kris Munter had poured.

Plaintiff refused, telling Garrett that he had finished his tasks for the day. Plaintiff claims that

Munter was standing several feet away playing a game on his phone. Garrett repeated the order

5

and Plaintiff walked away, reporting to Schafer. Plaintiff told Schafer that Garrett's treatment

"comes off racist to me . . ." *Id*. at 132. When questioned at his deposition, Plaintiff indicated he

was not 100% sure why Garrett had asked him to unclamp Munter's molds and complained that

it was "different treatment." *Id*. at 135. Plaintiff testified, however, that some of the difference in

treatment was likely due to Plaintiff not being as interactive as others, keeping to himself. *Id*. at

85.

Mr. Schafer attests, unchallenged, that after an investigation, Labor Relations was unable

to substantiate that Garrett had treated Plaintiff unfairly or differently because of his race. (Doc.

24-4 at 3). It was determined, however, the Plaintiff had refused to comply with a direct work

order and he received a verbal warning. Garrett was reminded of Caterpillar's policies against

discrimination, harassment, and retaliation.

THE TEMPERATURE PROBE INCIDENT

On November 22, 2019, Plaintiff worked on the furnace during the day shift. Plaintiff's

supervisor Garrett was on vacation, with Wade Ballinger covering for Garrett. Mr. Ballinger has

attested that Chad Ruark, the second shift worker who took over from Plaintiff, informed him

that a temperature probe had been wedged between the hydraulics tilt lever and the furnace

operator window. Mr. Ruark sent a corroborating photograph and stated that this had been done

by the first shift worker. Mr. Ruark explained that when the lever was wedged in this manner, it

would go down on its own, without the operator having to manually lower it. Ruark stated that

operators sometimes did this so they could walk away. Later that evening, Ruark told Ballinger

that the hydraulic pump was destroyed, resulting in production downtime.

On November 23, 2019, Ballinger checked the "Heat Sheet" of the day before and

determined that Plaintiff had been the first shift furnace operator. Mr. Ballinger attests that he

believed Plaintiff wedged the temperature probe which caused the destruction of the hydraulic

pump. He believes that Plaintiff did this so he could walk away from the furnace to perform

other tasks, conduct which he describes as unsafe. (Doc. 24-5 at 3).

THE LOCK OUT/TAG OUT INCIDENT

On November 25, 2019, another incident allegedly involving Plaintiff occurred regarding

the Lock Out/Tag Out "LOTO" procedures. Defendant has provided the declaration of Rachel

Alger, Environmental Health and Safety Manager at the Caterpillar Mapleton plant. Ms. Alger

provides a copy of the Policies Reference Guide regarding LOTO procedures and explains that it

allows an employee to lock out a piece of machinery to perform maintenance without the risk

that another, unaware, would try to operate it. When such work is to be done, the employee must

obtain a lock from the LOTO station and apply it to the machinery. Each employee is required to

put their personal tag on the lock. The tag has a photograph of the employee and identifies each

by name and serial number. After the employee has done the work, he is to remove his tag from

the lock and return the lock to the LOTO station. (Doc. 24-7 at 3). Ms. Alger attests that the

referenced policy provides that "Established lockout/tagout policies must be followed at all

times. . . . Failure to follow established lockout/tagout programs will result in disciplinary action

up to and including termination." (Doc. 24-7 at 28).

On November 25, 2019, Plaintiff texted Ballinger, stating that he needed a lock off of the

furnace. When Ballinger arrived at the furnace, he found there were two locks on it. One had

employee Ruark's personal tag attached to it and the other had Plaintiff's. Defendant has

provided copies of the pictures of the locks. Ballinger believed, from the placement of the locks,

that Plaintiff had placed the tag and lock during his previous shift and had not taken it off, in

violation of the LOTO safety policy. (Doc. 24-5 at 4). Plaintiff refutes this evidence with the

unsupported and confusing statement, "there was no lock had my tag and as showed in [C]aterpillar's evidence those are two different sceneries, locations, lighting and tags. I did not leave my tag on the furnace." (Doc. 26 at 3).

### THE INDEFINITE SUSPENSION

Mr. Ballinger attests that on November 25, 2019, Plaintiff was indefinitely suspended for the temperature probe incident of November 22, 2019 and the LOTO incident of November 25, 2019. Mr. Ballinger explains that an indefinite suspension was the next step in the progressive discipline process. He notes that Ruark, too, was disciplined for violating the LOTO safety policy. As Ruark had no prior discipline, he merely received a coaching session. *Id*.

The Union grieved Plaintiff's indefinite suspension and Caterpillar agreed to return him to work on December 16, 2019. Caterpillar placed Plaintiff on a 3-year Last Chance Agreement, demoted him to Materials Specialist-2, and reassigned him to the third shift. Plaintiff no longer reported to Codie Garrett and no longer worked with Munter or Watson.

On March 24, 2020, Plaintiff called the Caterpillar Ethics and Compliance Employee Hotline. He complained generally of "workplace violence/threats;" his 5-day suspension in September 2019; the October 10, 2019 incident with Munter and Watson; the October 29, 2019 incident with Watson and the alloys; his November 11, 2019 complaint regarding Garrett; and his November 25, 2019 indefinite suspension. Plaintiff asserted that he had been discriminated against because of his race, and that other employees were treated more favorably. Two days later, Plaintiff added the complaint that on September 28, 2018, Munter called him a "baby" when he suffered second degree burns to his foot. (Doc. 26 at 3). As Defendant notes, however, this occurrence is outside the applicable statute of limitations and the 300-day limit for filing a Discrimination Charge and is not further considered. (Doc. 24 at 17 n.7).

Andrew Schafer of Labor Relations has also provided an affidavit. He asserts that from December 16, 2019, when Plaintiff returned from the indefinite suspension through March 2020, Plaintiff was coached twice for attendance issues. In March 2020, Caterpillar offered Plaintiff 12 weeks of approved leave at 60% pay. Plaintiff did not return when the leave and his personal time had expired. After four days of this unapproved absence, Caterpillar terminated him for being absent without leave. Plaintiff does not claim that his termination was the result of either discrimination or retaliation. He asserts in his response that the issues in his employment left him "unhappy, depressed, bullied and felt low as a man and father. Returning to [C]aterpillar was not worth my peace. I felt as if it was time to let go, find other opportunities and take my report further than the building." (Doc. 26 at 4).

## III.   SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant if entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). When presented with a motion for summary judgment, the Court must construe the record "in the light most favorable to the nonmovant and avoid[] the temptation to decide which party's version of the facts is more likely true." *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). The moving party has the burden of providing proper documentary evidence to show the absence of a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323-24. Once a properly supported motion for summary judgment is filed, the burden shifts to the non-moving party to demonstrate with specific evidence that a triable issue of fact remains for trial. *Gracia v. Volvo Europa Truck, N.V.*, 112 F.3d 291, 294 (7th Cir. 1997). The party opposing summary judgment "must present definite,

competent evidence in rebuttal." *Butts v. Aurora Health Care, Inc.*, 387 F.3d 921, 924 (7th Cir. 2004).

Accordingly, the non-movant cannot rest on the pleadings alone, but must designate specific facts in affidavits, depositions, answers to interrogatories or admissions that establish that there is a genuine triable issue; he "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Finally, a scintilla of evidence in support of the non-movant's position is not sufficient to oppose successfully a summary judgment motion; "there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986).

## IV.   DISCUSSION

As previously noted, Plaintiff has not offered any Argument, cited caselaw, or distinguished the caselaw cited by Defendant. Plaintiff has only identified those of Defendant's Material Facts which he disputes.

### A.  RACIAL DISCRIMINATION

Plaintiff alleges that his 5-day suspension for throwing materials, and the indefinite suspension for wedging the temperature probe in the furnace and violating the LOTO procedure was evidence of racial discrimination. Title VII provides that an employer may not "discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin[.] 42 U.S.C. § 2000e-2(a)(1)." *Lawrence v. ZionSolutions, LLC*, No. 18-7128, 2021 WL 4988654, at *5 (N.D. Ill. Oct. 27, 2021).

Defendant denies that Plaintiff was subjected to racial discrimination, advancing its arguments under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under the *McDonnell Douglas* approach, "the plaintiff must show evidence that (1) [he or] she is a member of a protected class, (2) [he or] she was meeting the defendant's legitimate expectations, (3) [he or] she suffered an adverse employment action, and (4) similarly situated employees who were not members of her protected class were treated more favorably." *McDaniel v. Progress Rail Locomotive, Inc.*, 940 F.3d 360, 368 (7th Cir. 2019) (quoted citation omitted). The Seventh Circuit has cautioned, however, that facts are not to be consigned to a formulistic framework but viewed holistically, asking "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Ortiz v. Werner Enterprises, Inc*., 834 F.3d 760, 765 (7th Cir. 2016).

If Plaintiff establishes the *McDonnell Douglas* elements, the burden shifts to Defendant to identify a "legitimate, nondiscriminatory reason for the adverse employment action." If Defendant does so, the burden shifts back to Plaintiff to show that this reason is merely pretext and the real reason for the adverse action was discriminatory animus. *Johnson v. McDonald*, No. 15-11092, 2020 WL 374679, at *8 (N.D. Ill. Jan. 23, 2020). At the end of the day, the Court must assess the evidence as a "whole, rather than asking whether any particular piece of evidence proves the case by itself." *Id*. at *8 (quoting *Ortiz*, 834 F.3d at 765).

Here it is uncontroverted that Plaintiff, an African American, is a member of a protected class, establishing the first *McDonnell Douglas* factor. Defendant disputes the second factor, that Plaintiff was meeting its legitimate expectations. Defendant also disputes that Plaintiff has

identified sufficient evidence for the fourth factor, that other similarly situated employees who were not African American were treated more favorably.

Defendant argues that Plaintiff cannot sustain his racial discrimination claim because he was not meeting Caterpillar's reasonable expectations. That is, that the indefinite suspension was due to his various policy violations, not discriminatory animus. *Naik v. Boehringer Ingelheim Pharm., Inc.*, 627 F.3d 596, 600 (7th Cir. 2010) (plaintiff "must show that he was meeting [employer's] expectations at the time of his termination, which includes evidence that he did not violate [employer's] policies.")

As noted, Plaintiff was suspended in September 2019 for throwing 20–25 pound risers into a bucket from approximately five feet. Defendant has provided the declaration of Ballinger, who witnessed the event, considered it unsafe, and reported it to Plaintiff's supervisor, Garrett. In response, Plaintiff claims that the risers weigh 35 pounds and that he would not have the strength to throw them five feet, but does not outright deny that he threw the risers some distance. Regardless, Plaintiff testified at his deposition that he could not say that he was suspended due to his race. (Doc. 24-1 at 93).

Similarly, in the temperature probe incident, Plaintiff claims that he was blamed without proof, but does not outright deny the allegation. Defendant has provided evidence that Plaintiff worked on the furnace on the first shift, and that the second shift worker who succeeded him soon brought the issue to Ballinger's attention. Ballinger checked the Heat Sheet the following day and determined that Plaintiff was the operator at the time in question. Plaintiff does not address this evidence and does not affirmatively deny having wedged the temperature probe. In addition, Plaintiff makes no claim that either Ruark or Ballinger acted out of discriminatory animus.

As to the LOTO incident, while Plaintiff reflexively denies that he left a lock on the furnace, Ballinger has provided his own affidavit and photographs of the two locks, one of which has Plaintiff's picture and identifying tag. Plaintiff responds only with the confusing statement that the photographs showed different scenes and locations. The photographs, however, clearly show two locks on the equipment, one of which contains Plaintiff's picture and identifying tag. As noted, if Defendant provides evidence in support of summary judgment, the burden shifts and Plaintiff "must present definite, competent evidence in rebuttal." *Butts*, 387 F.3d at 924. Plaintiff has not unequivocally denied the allegations, identified contrary evidence, or offered any argument to support that he was wrongfully accused and the real reason for the discipline was discriminatory animus.

Plaintiff also fails to establish the last element of the *McDonell Douglas* analysis, that other similarly situated employees who were not members of his protected class were treated more favorably. While he claims that that he saw Kris Munter throwing risers on at least one occasion, he was not sure whether Munter threw the risers from a distance of five feet as he was accused of doing. While Plaintiff claims that there is video evidence of this, he does not provide it. In addition, Plaintiff did not testify that he told management of this incident or that anyone in management was aware.

Defendant also refutes the disparate treatment claim by pointing out that it disciplined others who were not members of Plaintiff's protected class. Defendant notes that Munter and Watson were each disciplined for confronting Plaintiff outside the bathroom. Munter, in fact, received an indefinite suspension, something which Plaintiff did not receive until the temperature probe and LOTO incidents, infractions which had occurred within days of each other.

13

Plaintiff makes the additional disparate treatment claim that Munter was allowed to return to the same job after his suspension, while Plaintiff's indefinite suspension involved a demotion, lower pay, and a move to third shift. Munter is not a suitable comparator, however, as he had had no prior disciplinary history while Plaintiff had and was on a 3-Year Last Chance Agreement. As a result, Plaintiff fails to establish that he and Munter were similarly situated, and that Munter received more favorable treatment.

The Court finds that Plaintiff has failed to identify facts to establish that he suffered racial discrimination, as he has failed to sustain his burden as to the second and fourth elements under *McDonnell Douglas*. The Court further finds that the result is same under an *Ortiz* holistic analysis as Plaintiff has failed to identify evidence which "would permit a reasonable factfinder" to find that any adverse employment action he suffered was due to his race. *See Ortiz*, 834 F.3d at 765.

As the Court finds that Plaintiff has not established a prima facie case of discrimination under *Ortiz* and *McDonnell Douglas,* it does not go on to conduct the *McDonnell Douglas* burden-shifting analysis, considering whether Defendant's proffered reasons for its actions were pretextual, with racial discrimination as the true motive. *See Chapman v. U.S. Steel, Div. of U.S.X.*, 12 F.3d 1100 (7th Cir. 1993) (only after the plaintiff establishes a prima facie case of discrimination does the burden shift to the defendant "to "articulate a legitimate, non-discriminatory reason for its action.").

### B. HOSTILE WORK ENVIRONMENT

Plaintiff's hostile work environment claims are based on the same allegations which support his discrimination claims. To sustain a Title VII hostile work environment claim and avoid summary judgment, a plaintiff must establish four elements: that the work environment

14

was subjectively and objectively offensive; plaintiff was subjected to harassment due to his status as a protected class member; the complained-of conduct was severe or pervasive; and there is a basis for employer liability. *Orton-Bell v. Indiana,* 759 F.3d 768, 773 (7th Cir. 2014) (internal citations omitted). In a hostile work environment claim, the Court is to examine "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23 (1993).

In support of his hostile work environment claim, Plaintiff asserts that Garrett treated him "differently;" that Schafer refused to transfer him after the confrontation with Munter and Watson; and Watson delivered him the wrong alloys. Defendant responds that Plaintiff cannot establish that any of these actions were due to Plaintiff's protected class. Defendant notes that Plaintiff has not alleged that he was the target of any racial slurs, epithets, or other overtly race-related behavior. Plaintiff generally did not allege racial animus at the time he complained of these occurrences, only stating that after further reflection he thinks this could have been a motivating factor. *See Patton v. Indianapolis Pub. Sch. Bd.*, 276 F.3d 334, 339 (7th Cir. 2002) (in a Title VII hostile work environment claim the plaintiff must have been "singled out" because of his race, as the hostility must be "based on a protected characteristic.") (internal citations omitted).

Defendant further alleges Plaintiff cannot substantiate that the conduct was so severe or pervasive that it altered the conditions of his employment. Defendant notes that Munter's and Watson's confrontation with Plaintiff did not appear racial in tone and only happened on the one occasion. (Doc. 24 at 25) (citing *Id.* at 339 denying hostile work environment claim based only on co-workers' "rude, arrogant, or boorish behavior.") Similarly, Garrett ordering Plaintiff to

15

unclamp Munter's molds on one occasion fails to support either racial motivation or a severe or persistent condition. *See EEOC v. RJB Properties, Inc.*, 857 F. Supp. 2d 727, 751 (N.D. Ill. 2012) (employee's subjective belief that she was required to do "extra" work is not a sufficient basis from which to infer that her work assignments were driven by an intent to harass her because she is Hispanic).

While Plaintiff made a general claim that Garrett came across as racist, this was premised on Garrett allegedly treating him differently. While Plaintiff asserted this, he also testified that Garrett might have treated him differently because he kept to himself and did not socialize with others. This is insufficient to counter Defendant's evidence the charge was not substantiated after an investigation and where Plaintiff made no claims of overt racism. Plaintiff also fails to support that the allegedly different treatment was so severe or pervasive as to create a hostile work environment.

Plaintiff also alleges that Watson brought him materials which were "wet" and "wrong" for the type of steel he was making and that the materials could have caused an explosion. The Court is aware, however, that Watson worked in the same areas as Plaintiff and would presumably have placed himself and others at risk if he knowingly delivered materials which could cause an explosion. When questioned at his deposition, Plaintiff testified that he did not know what alloys Watson brought him and did not know why Watson brought them. In his response, Plaintiff alleges that Watson might have done this because Plaintiff had complained about Minter. He offers no opinion, however, as to why Watson would have risked causing an explosion or why Garrett and Ballinger did not act when told of the event. Regardless, Plaintiff has not ascribed a discriminatory motive to Watson as is required to establish a hostile work environment claim. *Patton*, 276 F.3d at 339.

Plaintiff is also critical of Schafer for not transferring him from the melt deck. Plaintiff does not claim, however, that the refusal to move him was racially motivated stating, "I did not know why Schafer (sic) decline[d] to move me from the deck . . ." (Doc. 26 at 2). Plaintiff is suspicious of Schafer's instruction that if he wanted a transfer he was required to bid for a new position under the Collective Bargaining Agreement. While Plaintiff asserts that he did not have to bid when he was promoted to Material Specialist-4, he offers nothing to support that the same procedure would apply to a promotion as to a lateral transfer. Plaintiff does not respond at all to Schafer's attestation that the Collective Bargaining Agreement requires that an employee bid in order to transfer.

Defendant also asserts that the complained-of incidents are insufficient to impute employer liability for a hostile work environment. Defendant has provided evidence that it investigated the claims against Garrett, Munter and Watson. It could not substantiate the claims against Garrett, while substantiating those against Munter and Watson, disciplining them. *See Orton-Bell v. Indiana*, 759 F.3d 768, 774 (7th Cir. 2014) (finding that to be liable for a hostile work environment, an employer must have been at least negligent in its response).

Plaintiff took no further action after these investigations were concluded and did not file any subsequent complaints against Garrett, Munter or Watson. Despite this, Plaintiff resurrected these same claims in his March 24, 2020 call to the Caterpillar Ethics and Compliance Employee Hotline, for the first time clearly alleging racial discrimination and disparate treatment. But by then, the allegations had already been investigated and discipline meted out and Plaintiff was no longer working with Garrett, Munter and Watson. *See Jackson v. Cnty. of Racine*, 474 F.3d 493, 502 (7th Cir. 2007) ("[a]n employer's response to alleged instances of employee harassment must be reasonably calculated to *prevent further harassment* under the particular facts and

circumstances of the case at the time the allegations are made.") (citing *McKenzie v. Ill. Dept. of Transp.,* 92 F.3d 473, 480 (7th Cir.1996)). *See id*. (finding plaintiffs acted unreasonably where they unduly delayed informing the employer of the problem). Here, Plaintiff made only a vague reference of discrimination by Garrett, and none by Munter and Wilson in his initial complaints and only months later, after the investigations had concluded, affirmatively raised the issue of racial discrimination.

A jury could not reasonably find that Caterpillar maintained a hostile work environment where Plaintiff filed several complaints without clearly ascribing a racial motive to the complained-of behavior. *See e.g., Episcopo v. General Motors Corp.*, 128 Fed. Appx. 519, 523 (7th Cir. 2005) (employee unreasonably failed to make use of employer's anti- harassment policy because he never communicated that he was being harassed on the basis of his national origin). *See Luckie v. Ameritech Corp*., 389 F.3d 708, 713 (7th Cir. 2004) (in a hostile environment claim, plaintiff must show that the complained-of conduct had a racial character or purpose).

Plaintiff has not provided any argument in support of the hostile work environment claim, only answering Defendant's material facts with incomplete and unsupported denials insufficient to create a disputed issue of material fact. *Cardoso v. Cellco P'ship*, No. 13-2696, 2014 WL 6705282, at *1 (N.D. Ill. Nov. 26, 2014) ("Merely saying that a fact is disputed does not transform it into a disputed issue of fact sufficient to survive a motion for summary judgment.") (internal citation omitted); *Gabryszak v. Aurora Bull Dog Co*., 427 F.Supp.3d 994, 998-99 (N.D. Ill. 2019) ("It is inappropriate to include legal conclusions in a Rule 56 fact statement and at the summary judgment stage the plaintiff is required to point to evidence, not rely on the allegations in a complaint[.]") (internal citation omitted).

C. RETALIATION

Plaintiff claims that he was indefinitely suspended on November 25, 2019, in retaliation for his November 11, 2019 complaint that Garrett ordered him to unclamp Munter's molds and generally came across as racist. Title VII provides an anti-retaliation provision which prevents an employer retaliating against an employee who has sought protection under the Act. *Shefcik v. Vill. of Calumet Park*, 532 F. Supp. 2d 965, 985 (N.D. Ill. 2007) (citing *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53 (2006)). To prevail on a Title VII retaliation claim, a plaintiff must prove that (1) he engaged in a statutorily protected activity, (2) he suffered an adverse employment action, and (3) there is a causal link between the protected activity and the adverse action. *Brown v. Chicago Transit Auth.*, No. 17-08473, 2020 WL 777296, at *10 (N.D. Ill. Feb. 14, 2020) (citing *Lewis v. Wilkie*, 909 F.3d 858, 866 (7th Cir. 2018)). If Plaintiff establishes this, "the burden shifts to the employer to articulate some legitimate, nonretaliatory reason for its action. When the employer does so, the burden shifts back to the plaintiff, who must present evidence that the stated reason is a pretext, which in turn permits an inference of unlawful retaliation." *Boss v. Castro*, 816 F.3d 910, 918 (7th Cir. 2016) (internal citations omitted).

Defendant denies that Plaintiff's indefinite suspension evidenced retaliation, asserting that Plaintiff was suspended for documented violations of policy and safety regulations. *Id*. at 918 (finding that employee's failure to meet employer's reasonable expectations rebutted the presumption of retaliation); *Moultrie v. Penn Aluminum Int'l, LLC*, No. 11-00500, 2013 WL 1857150, at *5 (S.D. Ill. May 2, 2013), *aff'd,* 766 F.3d 747 (7th Cir. 2014) (denying title VII retaliation claim where employer's adverse employment action was due to plaintiff's "performance issues and mistakes on the job").

Here, there is no controversy that Plaintiff's complaint about Garrett constituted protected activity, and Defendant does not dispute that an indefinite suspension can constitute an adverse employment action. The remaining issue is one of causation, whether Plaintiff's complaint was a substantial or motivating factor in the decision to suspend him. *Culver v. Gorman & Co.*, 416 F.3d 540, 545 (7th Cir. 2005).

Defendant has provided the affidavits of Wade Ballinger who recommended the indefinite suspension and Andrew Schafer who approved it. Ballinger attests that he believed that Plaintiff had wedged a temperature probe into a furnace and violated LOTO safety procedures by failing to timely remove a lock from a piece of machinery. (Dec 24-5 at ¶14). Mr. Ballinger based his recommendation for suspension on these violations, and Plaintiff's position in the progressive discipline process. *See also* Schafer Declaration (Doc. 24-4 at 5) ("[Plaintiff] was indefinitely suspended (the next step in the progressive discipline process) for job performance including policy and safety violations."). *See Morrison v. Fifth Third Bank*, No.18-374, 2021 WL 2453969, at *23 (N.D. Ind. June 16, 2021) (finding that employer's reasonable belief that plaintiff violated policy foreclosed retaliation claim where plaintiff presented "no evidence or even a well-founded argument" to the contrary).

While Plaintiff would infer a causal connection between his November 11, 2019 complaint about Garrett and the November 25, 2019 indefinite suspension, he ignores several intervening events; the November 22, 2019 temperature probe incident and the November 25, 2019 LOTO incident. *See Morrison*, 21 WL 2453969, at *26 (citing *Crye v. Caterpillar, Inc*., No. 07-35, 2008 WL 5111349, at *7 (N.D. Ind. Dec.3, 2008) (granting summary judgment where employee was unable to establish causal connection due to intervening event of being captured on video taking lengthy breaks); *Caskey v. Colgate-Palmolive Co.*, 535 F.3d 585, 594 (7th Cir.

2008) (granting summary judgment where employee was unable to establish causal connection due to intervening event of unexcused absences).

As Defendant notes, a previously filed discrimination complaint will not immunize an employee in the face of substandard performance. *Argyropoulos v. City of Alton*, 539 F.3d 724, 734 (7th Cir. 2008) ("inappropriate workplace activities are not legitimized by an earlier-filed complaint of discrimination.") Defendant has provided competent and unchallenged evidence that Plaintiff was indefinitely suspended because of his prior disciplinary history and two significant safety infractions. Plaintiff, for his part, has not affirmatively denied liability for either incident, asserting only that Defendant did not have sufficient proof. Here, again, Plaintiff has failed to rebut the evidence provided by Defendant and has failed to substantiate his claim of retaliation.

## V.     CONCLUSION

For the reasons stated above, the Court GRANTS Defendant's Motion for Summary Judgment (Doc. 22). The Clerk is directed to enter judgment in favor of Defendant and against Plaintiff. This case is now TERMINATED.

ENTERED this 13th day of September 2022.


_____s/ James E. Shadid_____
JAMES E. SHADID
UNITED STATES DISTRICT JUDGE